STATE of Utah, Plaintiff and Appellee,

v.

Aaron T. BRANDLEY, Defendant
and Appellant.

No. 971421–CA.

Court of Appeals of Utah.

Dec. 17, 1998.

Kent E. Snider, Kent Snider & Associates, Ogden, for Appellant.

Brian J. Namba, Farmington, for Appellee.

Before Judges WILKINS, BENCH, and ORME.

## OPINION

ORME, Judge:

Defendant Aaron T. Brandley appeals his jury convictions for five counts of gross lewdness, a class A misdemeanor, in violation of Utah Code Ann. § 76-9-702(3) (Supp.1998).[1] Specifically, Brandley appeals the trial court's denials of his motion to suppress and his motion for new trial. The motions concern Brandley's rights under *Miranda* and his contention that his trial counsel was ineffective because members of counsel's law firm worked as prosecutors. We affirm.

## BACKGROUND

"On appeal from a jury verdict, the facts are recited in a light most favorable to the jury's verdict." *State v. Wright*, 893 P.2d 1113, 1115 (Utah Ct.App.1995). Similarly, when reviewing the denial of a motion to suppress, we "recite the facts in a light most favorable to the trial court's findings." *State v. Tetmyer*, 947 P.2d 1157, 1158 (Utah Ct. App.1997).

During March of 1996, the defendant, Aaron T. Brandley, was a student teacher at Clearfield High School. Brandley improperly touched five female students. As one student bent over to place books in her bag, Brandley walked by and placed his hand on her right buttock. This student testified that although Brandley did not actually grasp her buttock, the touch was clearly intentional. With the other four students, Brandley placed his cupped hand between their legs and touched their crotch areas. Each of these students likewise testified that Brandley's hand could not have accidentally touched their crotch areas. As one student stated: "He grabbed me like too far under to have it be accidental."

The students reported the incidents to school officials as well as the district superintendent, and each student identified Brandley as the man who touched her. On April 1, after these identifications, Sergeant Gianchetta, the school police officer, took statements from at least three of the five students describing the incidents. Gianchetta contacted Inspector William Holthouse of the Clearfield Police Department and turned over the information obtained during the school's investigation. Gianchetta also discussed the students' statements with Holthouse and informed Holthouse that one or more of the students had identified Brandley.

The next morning, Holthouse went to Clearfield High to interview possible suspects. After arriving at the school, Holthouse spoke with school officials, who asked him to interview Brandley. To conduct the interview, Holthouse proceeded to a school office which measured approximately ten feet by twelve feet. In this room, Holthouse sat on the far end of a table that was immediately to the right of the door. At Holthouse's request, the school administrator contacted Brandley and escorted him to the room. When he entered the room with Brandley, the administrator introduced Holthouse and left, closing the door behind him, but without locking it. Holthouse stood, identified himself as a police officer, shook Brandley's

---

1. As a convenience to the reader, and because the provisions in effect at the relevant times do not differ materially from the statutory provisions currently in effect, we cite to the most recent statutory codifications throughout this opinion, unless otherwise noted.

hand, and sat back down. Brandley sat down in the chair nearest the door. During the interview, which lasted ten to fifteen minutes, Holthouse was in street clothes rather than a police uniform. Although Holthouse was wearing a badge on his belt that Brandley may have seen, he did not expressly show him his badge or other identification. Holthouse never displayed his gun, raised his voice, or placed Brandley in handcuffs. Although Holthouse did not tell Brandley he was free to leave the room, he also did not place Brandley under arrest or otherwise indicate he was not free to leave. Holthouse never advised Brandley of his *Miranda* rights.[2]

During the interview, Holthouse told Brandley some girls at the school had accused him of touching them. Holthouse then used what he characterized as "detective ploy[s]," such as motioning to a folder that was unrelated to the case and implying that it contained incriminating information, and telling Brandley there were five girls who had been touched. Although he initially stated that he had no idea what Holthouse was talking about, Brandley responded to the latter ploy by saying he "didn't think that there were five." Holthouse then described the alleged contact as something he and his friends had referred to in high school as "scooping," and Brandley responded that he had not scooped the students. Holthouse explained that scooping consisted of forming your hand into a scoop position and Brandley responded that "that was possible." When Holthouse next asked why he did it, Brandley said "he didn't know why he did it but that he knew he needed to stop." At the end of the interview, Holthouse told Brandley he would consult with the county attorney and get back to him, but that Brandley should stay away from the school during the investigation. The administrator then returned to the room and escorted Brandley off the school premises.

On April 3, 1996, the State filed an information in Davis County charging Brandley with five counts of gross lewdness, a Class A misdemeanor, in violation of Utah Code Ann. § 76-9-702(3). Brandley hired attorney Michael V. Houtz of the law firm Helgesen, Waterfall & Jones as his defense counsel. On August 21, Brandley filed a motion to suppress the statements given to Officer Holthouse during the April 2 interview, arguing Brandley made the statements during a custodial interrogation and the statements were inadmissible because Holthouse failed to inform Brandley of his *Miranda* rights. Brandley submitted an affidavit in support of his motion in which he also denied making any incriminating statements to Officer Holthouse. Brandley stated that he may have "unintentionally brushed" students when the halls were crowded, but that he never touched anyone in the manner described by Holthouse, let alone those particular five female students.

The trial court held a hearing on the motion, and Holthouse testified to the interview's setting and content as described above. Holthouse also testified that at the time of the interview, so far as he was aware, only one student had positively identified Brandley as the man who touched her. Specifically, Holthouse stated he "did not have any indication the other four had identified Mr. Brandley at that time for sure." After the hearing, the trial court denied Brandley's motion to suppress. The court, relying on the four factors discussed in *Salt Lake City v. Carner*, 664 P.2d 1168, 1171 (Utah 1983), found that because Brandley was not in custody during the interview for *Miranda* purposes, *Miranda* warnings were not required.

At trial, the State called Holthouse to testify about the interview and Brandley's statements. On cross-examination, contrary to his testimony at the suppression hearing, Holthouse testified that before the interview with Brandley, he understood all five students had identified Brandley. With this admission, Brandley renewed his motion to suppress. After hearing arguments outside

---

**2.** *See Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966) (A suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.").

the jury's presence, the trial court noted that Holthouse's testimony differed from that at the suppression hearing, and that before the interview, Holthouse "knew that this investigation had focused pretty much exclusively on Mr. Brandley." The court took Brandley's renewed motion under advisement. Nonetheless, at the trial's conclusion, the court affirmed its earlier denial, finding that, under the totality of the circumstances, Brandley was not in custody for purposes of *Miranda.* The jury returned a guilty verdict on each of the five counts of gross lewdness charged in the information.

After trial, but before sentencing, Brandley, through new counsel, filed a motion for new trial, arguing that his previously retained attorney, Mr. Houtz, had a conflict of interest that deprived Brandley of the effective assistance of counsel. Although sentencing was scheduled for December 23, the trial court used this time to hear arguments on the motion for new trial. Brandley and the State stipulated that Richard W. Jones and Lucille Kelly Lowrey, members of Houtz's law firm, acted as prosecutors in Uintah, Weber County. The trial court denied Brandley's motion for a new trial, concluding the claimed conflict of interest was "irrelevant or merely hypothetical." The court also concluded that Brandley had not demonstrated that he received ineffective assistance by his trial counsel. This appeal followed.

## ISSUES AND STANDARDS OF REVIEW

■ Brandley appeals his convictions arguing, first, that the trial court erred in denying his motion to suppress statements made to Inspector Holthouse during the April 2, 1996, interview at the school because Brandley was in custody for *Miranda* purposes, but Holthouse never advised Brandley of his *Miranda* rights. "We review the trial court['s] factual findings underlying the deni-

al of a motion to suppress for clear error, while conclusions of law are reviewed for correctness." *State v. Galli,* 967 P.2d 930, 933 (Utah 1998). Whether, given the underlying facts, Brandley was in custody for *Miranda* purposes is a question of law we review for correctness. *See State v. Wood,* 868 P.2d 70, 83 (Utah 1993).

■ Second, Brandley argues the trial court erred in denying his motion for a new trial because Brandley received ineffective assistance from his counsel, in violation of his Sixth Amendment right.[3] When reviewing the denial of a motion for new trial based on an ineffective assistance of counsel claim, we defer to the trial court's factual findings unless clearly erroneous, but remain "free to make an independent determination of a trial court's conclusions." *State v. Templin,* 805 P.2d 182, 186 (Utah 1990). *Accord State v. Wright,* 893 P.2d 1113, 1119 (Utah Ct.App. 1995).

## I. MOTION TO SUPPRESS

" '[T]he safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with formal arrest." ' " *State v. Mirquet,* 914 P.2d 1144, 1146 (Utah 1996) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam))). To determine if a person is in custody, i.e., if his or her freedom of action is curtailed to an extent associated with formal arrest, we look to " '(1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of the interrogation.' "[4] *Id.* at 1147 (quoting *Salt*

---

3. Brandley also claims the ineffective assistance of counsel violated his rights under article I, section 12, of the Utah Constitution but provides no independent authority or argument. Accordingly, we consider his claim only under the Sixth Amendment to the United States Constitution. *See State v. Hovater,* 914 P.2d 37, 39 n. 1 (Utah 1996); *State v. Bredehoft,* 966 P.2d 285, 291 n. 4 (Utah Ct.App.1998).

4. Utah Courts have recognized a fifth factor, namely "whether the defendant came to the place of interrogation freely and willingly." *State v. Sampson,* 808 P.2d 1100, 1105 (Utah Ct.App.1990), *cert. denied,* 817 P.2d 327 (Utah 1991), *cert. denied,* 503 U.S. 914, 112 S.Ct. 1282, 117 L.Ed.2d 507 (1992). *Accord State v. Snyder,* 860 P.2d 351, 355 (Utah Ct.App.1993). In *Wood,* the Utah Supreme Court characterized this as simply one aspect of the third factor, i.e., wheth-

...

---

**82**

*Lake City v. Carner,* 664 P.2d 1168, 1171 (Utah 1983)). *See also Wood,* 868 P.2d at 82 n. 2 ("We now make clear that in Utah the appropriate standard for determining whether an interrogation prior to an arrest is custodial is that set out in *Carner.*"). The determination "depends on an objective assessment of the circumstances of the interrogation with respect to the compulsory nature of the interrogation." *Mirquet,* 914 P.2d at 1147.

■ Here, the site of Brandley's interview, the absence of objective indicia of arrest, and the length and form of the interrogation all weigh in favor of concluding that Brandley was not in custody. That is, the interview took place in a school office that was about ten feet by twelve feet, not in a police car or police station. A school administrator, not a police officer, asked Brandley to come to the room for the interview. Brandley willingly accompanied the administrator to the room. Once in the room, Holthouse stood, shook Brandley's hand, and asked him to have a seat. Brandley sat closest to the door which, although closed, remained unlocked. Although he identified himself as a police officer and Brandley may have seen the badge on his belt, Holthouse was not in uniform, never expressly showed his badge or identification, never raised his voice, and never displayed a weapon or handcuffs. Finally, the questioning lasted only ten to fifteen minutes. These facts show the interview was short, took place in a school room without the coercive environment of a police car or police station, and lacked the "indicia of arrest such as readied handcuffs, locked doors or drawn guns." *Carner,* 664 P.2d at 1171. These facts point to the conclusion Brandley was not in custody at the time of the interview.

In contrast, the remaining *Carner* factor, whether the investigation was focused on Brandley, heavily weighs toward concluding

that Brandley was in custody. Although the trial court initially determined that the interview was merely investigatory, after Holthouse's trial testimony the court changed its view and concluded that the investigation had focused exclusively on Brandley. We agree with the trial court that, because Holthouse knew before the interview that all five students had identified Brandley as the man who touched them, the investigation had focused on Brandley. Moreover, the accusatory manner of Holthouse's questioning—telling Brandley that five girls had identified him and indicating that Holthouse's folder contained incriminating information—communicated to Brandley that he was indeed the focus of the investigation.[5]

However, upon viewing all the circumstances surrounding the interview, we conclude that the trial court correctly determined that Brandley was not in custody during his interview with Holthouse. The other relevant circumstances of Brandley's interview suggest the absence of custodial interrogation and clearly outweigh the single factor that the investigation had focused on Brandley. Indeed, the Utah Supreme Court has expressly held that "[t]he necessary coercive environment cannot be established by accusatory questioning alone." *State v. Mirquet,* 914 P.2d 1144, 1148 (Utah 1996). *See Stansbury,* 511 U.S. at 324, 114 S.Ct. at 1529 ("'Nor is the requirement of warnings to be imposed simply because ... the questioned person is one whom the police suspect.'") (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam)) (omission in original). Because Brandley was not the subject of custodial interrogation, he was not entitled to the *Miranda* warnings, and the trial court correctly denied Brandley's motion to suppress.

---

er the objective indicia of arrest were present. *See Wood,* 868 P.2d at 82 n. 3.

**5.** Without this communication the environment would have been less coercive and would weigh against a determination that Brandley was in custody because "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the

question whether the individual is in custody for purposes of *Miranda.*" *Stansbury v. California,* 511 U.S. 318, 324, 114 S.Ct. 1526, 1529–30, 128 L.Ed.2d 293 (1994) (per curiam). *Accord State v. Worthington,* 970 P.2d 714, 717 (Utah Ct.App. 1998) ("[T]he deputy's subjective view that defendant was a suspect had no bearing on whether defendant was in custody.").

## II. CONFLICT OF INTEREST

Brandley also appeals the denial of his motion for a new trial, claiming he received ineffective legal assistance in violation of his Sixth Amendment rights. Brandley argues that his trial counsel, Michael V. Houtz, was constitutionally ineffective because Houtz had a conflict of interest imputed from Richard W. Jones and Lucille Kelly Lowrey, members of his firm, who also served as prosecutors in a different county.[6]

To support his claim of ineffective assistance of counsel, Brandley relies on *State v. Brown*, 853 P.2d 851 (Utah 1992), in which the Utah Supreme Court announced a per se rule of reversal where a defendant's appointed counsel is also a prosecutor in the same county. *See id.* at 859. However, Brandley incorrectly uses *Brown* as the standard for a *constitutional* challenge. The *Brown* court explicitly based its per se reversal rule on the Court's "inherent supervisory power over the courts [and] express power to govern the practice of law." *Id.* at 857. The *Brown* court "expressly declined to decide whether the appointment of attorneys with concurrent prosecutorial duties was constitutionally impermissible." *State v. Gordon*, 913 P.2d 350, 354 (Utah 1996). *See Brown*, 853 P.2d at 856. Therefore, as in *Gordon*, we analyze separately whether the *Brown* per se reversal rule applies here and whether Brandley received the effective assistance of counsel guaranteed by the Sixth Amendment. *See, e.g., Gordon*, 913 P.2d at 353–56. *See also id.* at 357 (Stewart, Assoc.C.J., dissenting) ("Regardless of whether the specific holding in *Brown* is applicable, the Sixth Amendment issue is raised whenever a defendant's attorney has a conflict of interest. . . .").

### A. Applicability of *State v. Brown*

■ In *Brown*, the Court determined that when appointed defense counsel has concurrent prosecutorial functions "it is unnecessary and ill-advised to pursue a case-by-case inquiry to weigh actual prejudice," and a defendant is entitled to automatic reversal. *Brown*, 853 P.2d at 859. Brandley argues that *Brown* equally applies to Houtz's claimed conflict of interest and, therefore, reversal is required in this case. We disagree.

The *Brown* court largely based the per se reversal rule on the threat to defense counsel's loyalty. *See id.* at 857–58 & n. 4.

> "[T]here inevitably will arise a struggle between, on the one hand, counsel's obligation to represent his client to the best of his ability and, on the other hand, a public prosecutor's natural inclination not to anger the very individuals whose assistance he relies upon in carrying out his prosecutorial responsibilities."

*Id.* at 857 (quoting *People v. Rhodes*, 12 Cal.3d 180, 115 Cal.Rptr. 235, 524 P.2d 363, 366 (1974)). Simultaneously serving as prosecutor and defense counsel subjects attorneys to conscious and unconscious influences such that they may be reluctant to attack the constitutionality of the laws they have sworn to uphold or to take a position they would find embarrassing as a prosecutor. *See id.* at 858. According to the Court in *Brown*, this dual role also inhibits defendants from fully confiding in their attorneys out of fear of admitting other criminal acts to a prosecutor and creates an appearance of impropriety which diminishes public confidence in the criminal justice system.[7] *See id.*

**6.** Brandley asserts that Jones and Lowrey also had prosecutorial functions in Davis County, where Brandley was tried. During the hearing on Brandley's motion for a new trial, however, the State stipulated only that Jones and Lowrey acted as prosecutors in Weber County. Brandley has provided no other support for his assertion of Jones's and Lowrey's prosecutorial work in Davis County.

**7.** It could be suggested that in rationalizing its per se rule, the *Brown* court underestimated both the force of an attorney's professional responsibility of unqualified loyalty to his client and the

benefits to his client of the unique insight and connections to prosecutorial and law enforcement circles that a defense attorney, who also has prosecutorial responsibilities, might offer.

It is also interesting to note that, in England, the tradition has long been that barristers have shared responsibilities in the criminal justice system, simultaneously prosecuting a number of cases while defending in a number of others. *See* Peter W. Tague, *Effective Advocacy for the Criminal Defendant: The Barrister vs. The Lawyer* 23 (1996) (The "cabrank" rule requires barristers to accept cases that are not professionally embarrassing so long as the fee is proper.

■ Because members of Houtz's firm—rather than Houtz himself—had prosecutorial functions, because these prosecutorial functions were in another county, and because Houtz was not appointed for an indigent but retained privately, the instant case is clearly distinguishable from *Brown.* Moreover, irrespective of the county where Jones and Lowrey fulfilled their prosecutorial functions,[8] or whether Houtz was appointed or privately retained,[9] the rationale underlying *Brown*'s per se rule does not apply here because it was members of Houtz's firm, and not Houtz himself, who had prosecutorial functions.

Although members of Houtz's firm have a professional duty of loyalty to Brandley,[10] it does not necessarily follow that an imputed conflict of interest carries the same level of danger to that loyalty, which could manifest itself in counsel's performance at trial such that an automatic reversal rule is required.[11] With an imputed conflict of interest, it is surely possible that defense counsel will be cognizant of the interests of other members in his or her firm. There is not, however, the same potential for divided loyalties as when one individual performs incompatible functions in the criminal justice system.

For example, our Supreme Court warned that when one person plays both roles, " 'the temptation might well arise not to be too hard on a police witness who is against your client today but would be the star witness for your prosecution tomorrow.' " *Id.* at 858

"Thus, the first solicitor to approach the barrister's clerk can retain that barrister, whether the solicitor seeks the barrister's help to prosecute or to defend.").

8. Although the Utah Supreme Court might choose to extend *Brown* in the future to those situations, like Brandley's, where the prosecutorial functions take place in other counties, such expansion does not appear imminent. Thus, the Court has observed that although "city prosecutors, as representatives of the state, share the same loyalties as state prosecutors," 853 P.2d at 859, "the conflict of interest faced by an appointed defense counsel who also has concurrent prosecutorial duties in another jurisdiction is much more remote." *Gordon,* 913 P.2d at 355.

9. Inasmuch as "it can never be in a defendant's best interests to be represented by counsel with prosecutorial obligations," at least according to

(quoting *Karlin v. State,* 47 Wis.2d 452, 177 N.W.2d 318, 321 (1970)). Even in abstract terms, this concern has little applicability to the instant case. Houtz himself had no prosecutorial responsibilities and thus would never have occasion to need a police officer's testimony to make his case. Moreover, even his associates and/or partners who prosecute do so in another community and would have little need to use a Layton City detective's testimony in prosecuting misdemeanor cases in the small town of Uintah, especially since these two municipalities are in different counties. And in actual terms, no such thing happened here. The strongest part of Brandley's case came during the cross-examination of Inspector Holthouse. On cross-examination, Houtz got Holthouse to contradict the testimony he gave during the suppression hearing and to testify that before his interview with Brandley, he actually knew five students had identified Brandley. This admission not only impeached Holthouse's credibility, it also provided the strong basis upon which Brandley renewed his motion to suppress and, indeed, persuaded the trial court to reconsider its determination. While the court did not ultimately change its decision, it at least changed its finding on one factor in its determination of whether Brandley was the subject of custodial interrogation. Such results hardly show any lack of zeal on Houtz's part.

Likewise, when a conflict of interest is imputed rather than direct, there is arguably

the *Brown* court, many of the Court's concerns apply equally to privately retained counsel. *Brown,* 853 P.2d at 858.

10. "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8(c), 1.9 or 2.2." Utah Rules of Professional Conduct 1.10(a).

11. The Rules of Professional Conduct make a distinction between a direct and an imputed conflict of interest. *Compare* Utah Rule of Professional Conduct 1.7(a) (providing that "[a] lawyer *shall not* represent" a client with interests which conflict with those of another client) (emphasis added), *with* Rule 1.10(a) (providing that no lawyers in a firm "shall *knowingly* represent" a client if any other lawyer in the firm were prohibited) (emphasis added).

less hesitation for defendants to confide in defense counsel. Unlike in *Brown*, the defendant is not asked to directly confide in a prosecutor. Rather, the defendant is being asked to confide in an attorney who merely shares an association with attorneys who prosecute elsewhere.[12]

For these reasons, we conclude that the prosecutorial functions of Jones and Lowrey, two members of defense counsel's firm, did not present the same dangers that justified the per se reversal rule in *Brown*. Accordingly, Brandley is not entitled to reversal under *Brown*.

### B. Ineffective Assistance of Counsel

Having concluded that Brandley is not entitled to reversal under *Brown*, we now turn to his claim that Houtz's alleged conflict of interest deprived him of his Sixth Amendment right to the effective assistance of counsel. Brandley claims that Houtz had a conflict of interest, imputed from the other members of his firm who had prosecutorial functions in another county. The State, however, argues that Brandley has not met his burden to show that an actual conflict of interest adversely affected Houtz's performance. We agree.

■ Generally, "[t]o demonstrate that his defense counsel's assistance was so inadequate as to constitute lack of [effective assistance of] counsel under the Sixth Amendment, [the defendant] must show that (1) his counsel's performance fell below an objective standard of reasonable professional judgment, and (2) he was prejudiced by the deficient performance." *State v. Gordon*, 913 P.2d 350, 355 (Utah 1996). *Accord Strick-*

land v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). However, when an ineffectiveness claim is grounded on a conflict of interest, we presume prejudice if the defendant demonstrates "that 'an actual conflict of interest adversely affected his lawyer's performance.'" *State v. Taylor*, 947 P.2d 681, 686 (Utah 1997) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980)), *cert. denied*, — U.S. ——, 119 S.Ct. 89, 142 L.Ed.2d 70 (1998). *Accord State v. Bredehoft*, 966 P.2d 285, 291 (Utah Ct.App.1998); *State v. Webb*, 790 P.2d 65, 73 (Utah Ct.App.1990). To establish an actual conflict of interest, defendants must show, as a threshold matter, that trial counsel "'"was required to make a choice advancing his own interests to the detriment of his client's interests."'" *Taylor*, 947 P.2d at 686 (citations omitted). Moreover, on appeal Brandley has the burden of demonstrating with specificity that the actual conflict existed and adversely affected Houtz's performance. *See State v. Johnson*, 823 P.2d 484, 488 (Utah Ct.App.1991).

■ Although both parties stipulated that Houtz's colleagues had concurrent prosecutorial duties, Brandley fails to show that Houtz was required to make a choice advancing either his own interests or those of his associates to the detriment of Brandley's interests. However, even assuming Houtz was faced with such a choice and that Brandley thereby established the existence of an actual conflict of interest, Brandley nonetheless fails to demonstrate how this actual conflict adversely impacted Houtz's performance.

**12.** Brandley argues that "Rule 1.10(a) is very clear that a conflict to any one member of a firm is attributable to every member of the firm." However, the express scope of the rules of conduct provides that "nothing in the Rule[s] should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty." Utah Rules of Professional Conduct, scope section. Accordingly, the issue here is not whether Houtz, Jones, Lowrey, or their firm have violated the rules of professional conduct. Rather, the issue is whether any such violation poses such a strong danger to adequate representation that Brandley's convictions should be reversed. The Utah State Bar is free to investigate and take appropriate action on

any attorney's ethical violations. *See State v. Larsen*, 828 P.2d 487, 492 (Utah Ct.App.1992) ("[A] criminal defendant 'is not automatically entitled to a reversal of his conviction' merely because of an apparent violation of a rule of professional conduct. [Rather], the 'appropriate remedy lies with the disciplinary arm of the Utah State Bar.'") (citations omitted), *aff'd*, 865 P.2d 1355 (Utah 1993). *See also* Op. 126, Utah State Bar Ethics Advisory Opinion Committee (1994) ("[T]he city attorney's partners, associates or those with whom the city attorney practices in situations that could be construed as a 'firm' cannot represent criminal defendants in any situation where the city attorney would be so prohibited.").

Indeed, as discussed above, one of the greatest dangers to representation with this dual-role type of conflict of interest is that defense counsel will hesitate to aggressively impeach a police witness whose testimony he—or his associates or partners—may need in a subsequent prosecution. Again, however, one of the strongest parts of Brandley's case came during the highly successful cross-examination of Inspector Holthouse, where defense counsel got Holthouse to change his testimony from that at the suppression hearing, calling into question his basic credibility and leading to a favorable finding on Brandley's renewed motion to suppress. Such performance shows that even if Houtz perceived the need to choose between helping his client or his associates, Houtz clearly chose his client. Accordingly, even assuming that an actual conflict of interest existed, it is clear the conflict did not adversely affect Houtz's performance.

Therefore, we conclude that because he has not shown that any conflict adversely affected the quality of his representation, Brandley was not deprived of the effective assistance of counsel required under the Sixth Amendment. Thus, the trial court did not err in denying Brandley's motion for a new trial.

## CONCLUSION

Although the investigation focused exclusively on Brandley at the time of the interview with Holthouse, the rest of the totality of the circumstances demonstrate that the interview was not coercive and that Brandley, therefore, was not in custody. Accordingly, the trial court correctly concluded that Brandley was not entitled to the *Miranda* warnings and properly denied Brandley's motion to suppress.

Because defense counsel's colleagues, rather than defense counsel himself, had prosecutorial duties in another county, *Brown*'s per se rule of reversal does not apply. And because Brandley has failed to show that Houtz had an actual conflict of interest which adversely affected his representation of Brandley, Brandley has not shown that he received ineffective assistance of counsel in contravention of his Sixth Amendment rights.

Consequently, the trial court correctly denied Brandley's motion for a new trial.

Affirmed.

WILKINS, Associate Presiding Judge, concurs.

BENCH, Judge.

I concur, except that as to Section I, I concur only in the result: